IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DANESH VARNER,<br><br>       Plaintiff,<br><br>  v.<br><br>SHORESIDE PETROLEUM, INC.,<br><br>       Defendant. | Case No. 3:18-cv-00189-TMB<br><br>ORDER ON MOTION FOR SUMMARY<br>JUDGMENT (DKT. 15) |

## I.  INTRODUCTION

The matter comes before the Court on Defendant Shoreside Petroleum, Inc.'s ("Shoreside") Motion for Summary Judgment (the "Motion").[1] Shoreside seeks summary judgment on the two claims at issue: Plaintiff Danesh Varner's ("Varner") claim for unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and his claim for racial discrimination and retaliatory discharge under the Civil Rights Act, 42 U.S.C. § 1981.[2] The Motion was fully briefed.[3] The parties have not requested oral argument and the Court finds that it would not be helpful. For the reasons stated below, Shoreside's Motion for Summary Judgment at Docket 15 is **GRANTED**.

---

[1] Dkt. 15 (Motion).

[2] Dkt. 16 at 1–2 (Memorandum in Support).

[3] Dkts. 15, 19 (Response), and 22 (Reply).

## II.    BACKGROUND

This is an employment action, removed from the Superior Court from the State of Alaska and brought against Shoreside under the FLSA and the Civil Rights Act.[4] Varner's Complaint advances two claims.[5] First, Varner claims that Shoreside failed to pay him for over 5,776 hours of overtime in violation of the FLSA.[6] Second, Varner claims that while employed at Shoreside, he was subject to racial discrimination and unlawful retaliation in violation of the Civil Rights Act.[7] Varner has since conceded his claims under the Civil Rights Act and only advances his FLSA claim.[8] The relevant evidentiary record is largely undisputed by the parties and is summarized below.

### A.    *Varner's Employment at Shoreside*

"Shoreside is an Alaska corporation that distributes fuel and lubricants throughout the state."[9] Shoreside's main office and distribution center is located in Anchorage, Alaska.[10] In June 2010, Varner was hired to work as a truck driver for Shoreside.[11] Nearly one year later, in May

---

[4] Dkt. 1-1 at 4–5 (Complaint).

[5] *Id.*

[6] *Id.* at 4. In his response to the Motion, Varner claims 11,974 unpaid hours. Dkt. 19 at 8. However, the discrepancy between the number of hours alleged in the Complaint and the number reported in subsequent filings is immaterial to the Court's disposition of the Motion.

[7] Dkt. 1-1 at 5.

[8] Dkt. 19 at 3.

[9] Dkt. 19-1 at 1 (Dispatcher Compensation Agreement).

[10] *Id.*

[11] Dkt. 1-1 at 2.

2011, Varner became a dispatcher.[12] As a dispatcher for Shoreside, Varner would dispatch fuel delivery drivers to customers in locations throughout Alaska.[13] He was "the first point of contact for [Shoreside's] customers and delivery truck drivers."[14] During the day, Varner would work from Shoreside's Anchorage distribution center.[15] Additionally, "Shoreside [found] it necessary to provide 24 hour coverage to meet customer needs."[16] Therefore, outside of business hours, Varner routinely carried Shoreside's "after-hours" phone.[17] As a dispatcher, Varner was responsible for "answering the on-call phone, dispatching drivers, and responding to any customer or internal needs during non-business hours."[18]

Varner describes his work schedule as being irregular.[19] Varner asserts that, at first, no told him what time he was expected to begin his dispatcher shift each day.[20] However, he claims he was told near the end of his tenure as dispatcher that he was expected to begin work at 8:00 a.m.[21] Nevertheless, Varner states that he would usually begin his day shift around 5:00 a.m. in order to complete paperwork for Shoreside's linehaul department and transmit it to Shoreside's

---

[12] Dkt. 19-1 at 1.

[13] *Id.*

[14] Dkt. 20 at 2 (Varner's Affidavit).

[15] *Id.*

[16] Dkt. 19-1 at 1.

[17] Dkt. 20 at 2–3.

[18] Dkt. 19-1 at 1.

[19] Dkt. 19-2 at 4–6.

[20] *Id.* at 6–7.

[21] *Id.*

Seward office before the start of business.[22] Varner recalls that Shoreside closed its main office at 6:00 p.m. each day.[23] However, depending on what occurred during business hours that day, Varner states that he may have stayed much later.[24] Varner—to his recollection—never memorialized the hours that he worked during the day on a timesheet.[25] Instead, Varner asserts that he would inform his supervisors of the time he had worked.[26] Accordingly, Varner admits that he was paid for all hours he worked in the office.[27]

After he completed his day shift, Varner was required to transfer all of Shoreside's incoming calls to the mobile after-hours phone, which he was required to keep after business hours.[28] During his time after-hours, Varner was expected to receive and respond to every incoming call.[29] In some cases, Varner would need to travel "on-site" to handle situations that arose after-hours.[30] In his first year as dispatcher, Varner was responsible for the after-hours phone every day, other than days he had taken a leave of absence from work.[31] Varner states that beginning his second year as dispatcher, Varner would be relieved from the after-hours phone

---

[22] Dkt. 19-2 at 4.

[23] *Id.* at 6.

[24] *Id.*

[25] *Id.* at 7.

[26] Dkt. 16-2 at 3.

[27] *Id.*

[28] Dkt. 20 at 2.

[29] *Id.*

[30] Dkt. 19-2 at 8.

[31] Dkt. 20 at 3.

every other weekend.[32] Varner claims that he was never told, in advance, when or if he could turn off the after-hours phone.[33]

Before November 2015, Shoreside compensated Varner for carrying the after-hours phone by paying him a minimum of two hours of overtime pay for each week he held the phone.[34] For weeks in which he worked more than two hours, he was required to report those additional hours so that he could be compensated accordingly.[35] In October 2015, Varner raised concerns about his after-hours work schedule and pay arrangement with Trina Kindred, Shoreside's Human Resource Manager.[36] Subsequently, Shoreside developed a Dispatcher Compensation Agreement.[37] Around the time the Dispatcher Compensation Agreement was drafted, Shoreside implemented a new rotation for the after-hours phone.[38] Under the new rotation, someone other than Varner carried the after-hours phone every other week and for two days of the weeks Varner carried the phone.[39] Additionally, beginning November 2015, Shoreside compensated those who held the after-hours phone for a minimum of two hours of overtime each day.[40] Like before, under the new payment

---

[32] Dkt. 16-2 at 5.

[33] Dkt. 20 at 2.

[34] Dkt. 16-3 at 1 (Trina Kindred's Affidavit).

[35] *Id.* at 2; Dkt. 16-4 (Shoreside Employee Handbook Excerpt).

[36] Dkt. 19-4 (Email to Kindred).

[37] Dkt. 19-1.

[38] Dkt. 16-2 at 20.

[39] *Id.*

[40] Dkt. 19-1 at 1.

scheme, employees who carried the after-hours phone were required to report hours worked in excess of two hours in order to receive overtime payment for the excess hours.[41]

While working for Shoreside, Varner "did not document each minute spent answering calls to the after-hours phone, or document each and every minute spent driving to a spill site to assist with cleanup during the after-hours shift."[42] Nevertheless, it is undisputed Shoreside was aware of the days he carried the after-hours phone.[43] During the period between February 13, 2014 and October 24, 2015, Varner was paid a regular wage of $23.75 per hour and an overtime wage of $35.63 per hour.[44] After October 24, 2015, Varner's compensation increased to $24.55 for regular hours and $36.83 for overtime hours.[45]

In 2016, Shoreside installed a dispatch computer program and decided to eliminate the position of dispatcher.[46] Varner worked as a dispatcher until October 15, 2016 and, after the dispatcher position was eliminated, was transitioned back into the role of truck driver.[47] In 2017, Varner filed a complaint with the Anchorage Equal Rights Commission and the United States

---

[41] *Id.*

[42] Dkt. 20 at 4.

[43] *Id.* at 3.

[44] *Id.* at 4.

[45] *Id.*

[46] Dkt. 16-2 at 20.

[47] *Id* at 21.

Equal Employment Opportunity Commission ("EEOC").[48] Subsequently, on April 14, 2017, Varner announced his resignation from Shoreside.[49]

## III.  LEGAL STANDARD

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[50] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[51] Material facts are those which might affect the outcome of the case.[52] A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[53] "There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion."[54] A movant's burden may be met by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[55]

---

[48] Dkts. 16-5 (Charge of Discrimination); 16-7 (EEOC Dismissal).

[49] Dkt. 16-6 (Varner's Letter of Resignation).

[50] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[51] Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130–31 (9th Cir. 1994).

[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[53] *Id.* at 248.

[54] *Mills v. Wood*, No. 4:10-CV-00033-RRB, 2015 WL 2100849, at *1 (D. Alaska May 6, 2015), *aff'd in part*, 726 F. App'x 631 (9th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

[55] *Celotex*, 477 U.S. at 325.

Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial.[56] "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."[57] Finally, "[w]here . . . the case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy is a question of law suitable for disposition on summary judgment."[58]

## IV.    ANALYSIS

Shoreside moves for summary judgment on both claims raised in Varner's complaint.[59] Namely, that Shoreside failed to pay him for over 5,776 hours of overtime in violation of the FLSA and that while employed at Shoreside, Varner was subject to racial discrimination and unlawful retaliation in violation of the Civil Rights Act.[60] In his Response, Varner concedes his discrimination and retaliation claims.[61]

Accordingly, Shoreside's Motion for Summary Judgment is **GRANTED** as to Varner's claims brought under the Civil Rights Act.

---

[56] *Id.* at 323–24.

[57] *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

[58] *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1262 (9th Cir. 2016) (quoting *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011)).

[59] Dkt. 16 at 1–2.

[60] Dkt. 1-1 at 4–5.

[61] Dkt. 19 at 3.

The Court now turns to Shoreside's Motion as it relates to Varner's FLSA claim. Shoreside argues that Varner has failed to meet his burden to prove any of the elements of an FLSA claim.[62] First, Shoreside argues that Varner was not entitled to overtime pay for all the time he carried the after-hours phone—rather, he was only entitled to payment for time actually spent responding to calls.[63] Second, Shoreside argues that Varner is unable to show that Shoreside had actual or constructive knowledge of his overtime work.[64] Third, Shoreside argues that Varner cannot prove the amount of time he actually worked as a matter of just and reasonable inference.[65]

In his Response, Varner contests each of Shoreside's arguments. First, Varner argues that the nature of Varner's duties and limitations while holding the after-hours phone entitled him to overtime pay for every hour he held the after-hours phone.[66] Second, Varner argues that Shoreside had actual knowledge of the time Varner spent on-call, and therefore, knew of his overtime work.[67] Third, Varner argues, since there is no dispute of the nights he worked as the after-hours dispatcher, there is a clear accounting of the time for which Varner is entitled to payment.[68]

Under the FLSA, for a workweek longer than forty hours, employers must pay their employees "a rate not less than one and one-half times the regular rate at which he is employed."[69]

---

[62] Dkt. 16 at 7.

[63] *Id.* at 7–15.

[64] *Id.* at 15–17.

[65] *Id.* at 17.

[66] Dkt. 19 at 14–15.

[67] *Id.* at 15.

[68] *Id.*; Dkt. 20 at 7–40.

[69] 29 U.S.C. § 207(a)(1).

To prevail on an unpaid overtime claim under the FLSA, a plaintiff must prove the following four elements: (1) the uncompensated activity constitutes "work," (2) the time worked is not de minimis and is reasonable in relation to the principal activity (3) the employer had actual or constructive knowledge of the plaintiffs overtime work, and (4) the amount of time worked.[70] Plaintiffs can carry their burden on the fourth element by proving they "performed work for which [they] [were] improperly compensated" and producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[71]

A. *Whether Varner's Uncompensated Time with the After-Hours Phone Constituted "Work"*

Varner claims that he was on duty "[a]s soon as Shoreside's business phones were transferred to the after-hours dispatcher phone" and "not completely relieved of his duties until the phone was transferred back the next morning."[72] Based on this understanding, Varner has provided calendars which document his estimation of the number of hours he worked as Shoreside's after-hours dispatcher.[73] Ultimately, he claims that February 13, 2014 through October 24, 2015, he worked 8,220.5 hours of unpaid overtime, and between October 25, 2015 through October 10,

---

[70] *Dixon v. City of Forks*, No. C08-5189 FDB, 2009 WL 1459447, at *3–6 (W.D. Wash. May 26, 2009), as clarified, No. C08-5189 FDB, 2009 WL 1608506 (W.D. Wash. June 9, 2009) *accord Maciel v. City of Los Angeles*, 569 F. Supp. 2d 1038, 1045 (C.D. Cal. May 29, 2008).

[71] *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) *superseded on other grounds by statute*, Portal–to–Portal Act of 1947, 29 U.S.C. § 254.

[72] Dkt. 19 at 15.

[73] Dkt. 20 at 7–40.

2016 he worked 3,753.5 hours of unpaid overtime.[74] Using his overtime hourly wage during these periods, Varner claims to be entitled to $431,137.83.[75]

Numerous courts have addressed the question now before the Court—whether an employee is entitled to compensation for time spent on-call.[76] However, there is no bright-line rule, which mandates an outcome in any given case. Rather, as the Supreme Court has stated, "no principle of law found either in the statute or in Court decisions precludes waiting time from also being working time[,] we cannot . . . lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time."[77] To guide courts in determining whether time spent "on-call" is compensable, the Ninth Circuit counsels that "the two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are (1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties."[78]

---

[74] Dkt. 20 at 5.

[75] *Id.*

[76] *See, e.g.*, *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 942–43 (9th Cir. 2004) (holding hydroelectric utility workers' on-call time was only partially compensable); *Berry v. Cty. of Sonoma*, 30 F.3d 1174, 1187 (9th Cir. 1994) (holding county coroners' on-call time was not compensable); *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 356–57 (9th Cir. 1992), as amended (Aug. 18, 1992) (holding mechanics' on-call time was not compensable); *Shultz v. City of Tucson*, No. CV 02-069-TUC-RCC, 2005 WL 8160754, at *6–7 (D. Ariz. Oct. 25, 2005) (holding police detectives' time on-call was not compensable); *Vonbrethorst v. Washington Cty., Idaho*, No. CV06-0351-EJL, 2008 WL 906036, at *12 (D. Idaho Mar. 31, 2008) (denying summary judgment on the question); *McCoy v. N. Slope Borough*, No. 3:13-CV-00064-SLG, 2013 WL 4510780, at *8 (D. Alaska Aug. 26, 2013), clarified on denial of reconsideration, No. 3:13-CV-00064-SLG, 2013 WL 12308204 (D. Alaska Sept. 11, 2013) (denying summary judgment on the question).

[77] *Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944).

[78] *Brigham*, 357 F.3d at 936 (quotations omitted).

1. <u>Whether Varner Was Free to Engage in Personal Activities While Holding the After-Hours Phone</u>

In *Owens*, the Ninth Circuit articulated a non-exhaustive list of factors to consider whether an employee's "waiting" time allows him to use his time effectively for his own purposes.[79] The factors include:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether the use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.[80]

"Because [n]o one factor is dispositive, a court should balance the factors permitting personal pursuits against the factors restricting personal pursuits to determine whether the employee is so restricted that he is effectively engaged to wait."[81]

Varner argues the *Owens* factors are inapplicable to this case.[82] He contends that *Owens* considered employees who remained on-call even though they were off-duty while Varner was "never 'off-duty.'"[83] However, this argument assumes the ultimate question before the Court. The purpose of applying the *Owens* factors is to determine whether an employee is "working" while

---

[79] *Owens*, 971 F.2d at 351.

[80] *Id.*

[81] *Berry*, 30 F.3d at 1183 (quotations omitted).

[82] Dkt. 19 at 11.

[83] *Id.*

12

on-call.[84] Here, it is not disputed that Varner was on-call while he held the after-hours phone.[85] However, it is vigorously disputed whether or not the nature of his responsibilities rendered him "working," under the FLSA, for the entire time he held the after-hours phone.[86] Therefore, the *Owens* factors are appropriately applied here.

### a. Whether There Was an On-Premises Living Requirement

It is undisputed that Varner was not required to live on Shoreside's premises while he held the after-hours phone.[87] Therefore, this factor weighs against a finding that Varner's time on-call was compensable.

### b. Whether There Were Excessive Geographical Restrictions on Varner's Movements

Courts applying the second *Owens* factor have examined geographical restrictions in two ways. First, some courts have determined geographical restrictions by the transmission radius of radios or where employees are required to stay within earshot of a phone or alarm.[88] However, other courts have looked to whether a required response time places a *de facto* geographic restriction on the employee.[89]

---

[84] *Owens*, 971 F.2d at 350–57. *See also Brigham*, 357 F.3d at 935–38 (applying the *Owens* factors to consider whether on-call time "constituted compensable working time within the meaning of the FLSA").

[85] Dkts. 16 at 19; 19-1 at 1.

[86] Dkts. 16 at 14–15; 19 at 15–16.

[87] Dkt. 16-3 at 2.

[88] *See Brigham*, 357 F.3d at 936; *Cross v. Arkansas Forestry Comm'n*, 938 F.2d 912, 916 (8th Cir. 1991).

[89] *See Brigham*, 357 F.3d at 936–37; *Vonbrethorst*, 2008 WL 906036, at *4 (holding a geographic restriction was excessive where employees were required to be on-scene within five minutes of a call).

In *Brigham*, employees at a hydroelectric plant were required to remain within earshot of their home phones and alarm systems.[90] If an employee received an emergency call, they were obligated to reach the work-site "as soon as humanly possible."[91] The *Brigham* Court reasoned that "[b]ecause the employees had to be able to hear their phones ring at all times and were required to respond instantaneously to alerts and calls while on their duty shifts, they were effectively tethered to their homes."[92] Thus, the geographic restrictions in *Brigham* were "severe."[93]

In contrast, *Berry* concerned on-call coroners who were required to respond to death reports within fifteen minutes of a page or telephone call.[94] For example, when the on-call coroner received a death report, the coroner either conducted an investigation by telephone and, depending on the nature of the case, visited the scene.[95] However, the court noted, "this required response is substantially different than being required to return to the employer's premises within twenty minutes[,]" and concluded "the required response by telephone or two-way radio within fifteen minutes is not a factor prohibiting the coroner's personal pursuits."[96]

---

[90] *Brigham*, 357 F3d at 936.

[91] *Id.* at 937.

[92] *Id.*

[93] *Id.*

[94] *Berry*, 30 F.3d at 1185.

[95] *Id.* at 1178.

[96] *Id.* at 1184. Likewise, in reaching its decision in *Owens*, the Ninth Circuit relied on *Bright v. Houston Northwest Medical Center Survivor, Inc.*, 934 F.2d 671 (5th Cir. 1991) (en banc), a Fifth Circuit case where an on-call technician was required to respond within 20 minutes of a call. *Owens*, 971 F.2d at 351–52. *Bright* held that the worker could go virtually anywhere within the 20-minute response radius and was not overly restricted. *Bright*, 934 F.2d at 672.

Here, Varner stated that no one at Shoreside told him that he could not go beyond a certain geographical range.[97] The undisputed facts on the record indicate that Varner was rarely required to report to a specific location when responding to a call on the after-hours phone.[98] Therefore, Shoreside's required response time—to the extent it existed—did not render Varner's geographic restrictions excessive.

However, while holding the after-hours phone, Varner was required to remain within cell-phone coverage in order to respond to calls.[99] Thus, like the coroners in *Berry*, who were required to be in areas accessible by a pager, Varner's range was somewhat limited.[100] For instance, Varner indicates that on prior trips south to Seward, Alaska, or north to a "lake out near the glacier," he would lose service, miss calls, and be reprimanded by his supervisors at Shoreside.[101] However, the Court finds that even if Varner was limited to remaining in Anchorage, Alaska, while he was on-call, the restriction would not be excessive.[102] Like in *Bright*, if Varner had a longer "leash," he may have been able to do more things and see more places, "but that does not mean that within the applicable restrictions he could not effectively use the on-call time wholly for his own private purposes."[103] Therefore, this factor weighs against a finding that Varner's time with the after-hours phone was compensable.

---

[97] Dkt. 16-2 at 12.

[98] Dkt. 16-3 at 2.

[99] *Id.*

[100] *Berry*, 30 F.3d at 1178.

[101] Dkt. 16-2 at 13.

[102] *Id.* at 11–12.

[103] *Bright*, 934 F.2d at 678.

### c. Whether the Frequency of Calls Was Unduly Restrictive

Varner estimates that the volume of calls that he received on the after-hours phone fluctuated from zero to ten calls per shift.[104] Varner claims that the regular volume of calls disrupted his life after business hours.[105] He alleges that the frequency of calls became so disruptive that his wife refused to share his bed while he had the after-hours phone.[106] Varner further recalls that the two times he attempted to attend the movie theater while on-call he was interrupted by calls. [107]

In *Berry*, the court found 3–4 calls in a 24–hour shift restrictive.[108] There is a genuine dispute on the record of the volume of calls received, the amount of time Varner spent responding to calls, and whether the frequency of calls was an undue burden on his ability to engage in private pursuits.[109] Construing the disputed facts on the record in favor of Varner, the Court finds that this factor weighs in favor of a finding that Varner's time with the after-hours phone was compensable.

---

[104] Dkt. 16-2 at 4.

[105] *Id.* at 17.

[106] *Id.*

[107] Dkt. 19-2 at 12–13.

[108] *Berry*, 30 F.3d at 1186.

[109] Dkt. 16-2 at 4. Shoreside disputes the number of calls fielded by Varner on any given shift. *See* Dkt. 16 at 2 n.7.

*d. Whether a Fixed Time Limit for Response Was Unduly Restrictive*

In *Owens* and subsequent cases that apply the *Owens* factors, the response time factor has considered the time to respond to a particular location.[110] As discussed above, Varner only rarely needed to respond to a particular location to respond to calls.[111] The record does show that Varner occasionally would respond to work sites to address spills.[112] However, such instances were infrequent.[113] Only four times in the last year he was employed at Shoreside, did Varner respond to an incident in person.[114] Further, Varner has not alleged that he was subject to a certain response time when he had to respond on-scene.

In *Berry*, the court held that where an employee was required to respond via telephone after receiving a page, it "[was] not a factor prohibiting the [employee's] personal pursuits."[115] Varner asserts that Shoreside company policy dictated that he answer a call within three rings.[116] This expectation included calls received on the after-hours phone.[117] Although this is a shorter timeframe than the 15-minute window in *Berry*, *Berry*—decided in 1994—considered employees

---

[110] *Owens*, 971 F.2d at 351–54 (collecting cases where employees were required to report to a specific location when called); *Brigham*, 357 F.3d at 937 (employees required to report to the powerhouse "as soon as humanly possible").

[111] Dkt. 16-3 at 2.

[112] *See, e.g.*, Dkt. 16-2 at 15.

[113] Dkt. 16-3 at 2.

[114] Dkt. 16-2 at 9.

[115] *Berry*, 30 F.3d at 1184.

[116] Dkt. 16-2 at 8.

[117] *Id.*

equipped with pagers who may need up to 15 minutes to locate a telephone.[118] With the advent of mobile phones, the process to answer a call becomes less onerous and requires less time. The only response time limit discussed in the record—the three-ring policy—was not unduly restrictive. Therefore, this factor weighs against a finding that Varner's time with the after-hours phone was compensable.

> e. *Whether the On-Call Employee Could Easily Trade On-Call Responsibilities*

There is no evidence on the record that indicates Shoreside had a policy against trading shifts. Where there is "no policy against trading shifts and no evidence to support a conclusion that trading shifts is difficult," this factor weighs against finding that plaintiff's on-call time was compensable.[119] Furthermore, courts have found that where there is evidence that an employee can trade on-call shifts while they are injured or while a family member is sick, this factor ought to weigh against the compensability of on-call time.[120]

The record shows that Varner could freely trade shifts when requested.[121] For example, when he requested for time off from the after-hours phone in order to attend family events, Varner admitted that the request was never denied.[122] Varner also admits that he was able to have someone cover the after-hours phone while he took vacations or took sick leave.[123] Varner describes that he

---

[118] *Berry*, 30 F.3d at 1185.

[119] *Id.* at 1184–85.

[120] *Watson v. Yolo Cty. Flood Control & Water Conservation Dist.*, No. CIV. S-06-1549 FCD DAD, 2007 WL 3034267, at *11 (E.D. Cal. Oct. 17, 2007) (when plaintiff was injured and his wife was sick, other employees were able to perform the damtender duties).

[121] Dkt. 16-2 at 11.

[122] *Id.* at 19.

[123] *Id.* at 10.

and his co-workers were able to freely trade shifts when desired.[124] Therefore, this factor weighs against a finding that Varner's time with the after-hours phone was compensable.

> ### f. Whether the Use of a Pager Could Ease Restrictions

This factor has become, as Shoreside notes, somewhat anachronistic.[125] The after-hours phone at issue here is essentially a pager and telephone in one. However, courts discussing this factor typically consider whether employees were required to be tethered to a location with a fixed landline.[126] For instance, the court in *Berry* found that "by being able to use a pager, the coroners [were] not restricted to areas with a telephone or two-way radio."[127] Likewise, in *Owens* the court noted that the purpose of a pager was to "allay necessity of remaining by a phone" while on-call.[128]

Here, because the after-hours phone was a mobile phone, Varner was not tethered to any location or required to remain by a landline. Resultantly, Varner had greater freedom to pursue personal activities while on-call. Therefore, this factor weighs against a finding that Varner's time with the after-hours phone was compensable.

> ### g. Whether the Employee Had Actually Engaged in Personal Activities While On-Call

Under this factor, courts must not look to whether an employee is prevented from participating in certain personal activities but, instead, must determine whether they engaged in personal activities while on-call.[129] An employee on-call need not "have substantially the same

---

[124] Dkt. 16-2 at 11.

[125] Dkt. 16 at 12.

[126] *Berry*, 30 F.3d at 1184; *Owens*, 971 F.2d at 351 n.13; *Brigham*, 357 F.3d at 936.

[127] *Id.* at 1184.

[128] *Owens*, 971 F.2d at 351 n.13.

[129] *Berry*, 30 F.3d at 1185.

flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject."[130]

In *Brigham*, workers "were able to use portions of their duty shifts to: sleep, eat, read, study, exercise, watch television, help their children with homework, play games, maintain their homes and yards, work on their motorcycles, and entertain guests."[131] Nevertheless, because employees were tethered to their homes, the *Brigham* court found that this factor narrowly weighed in favor of the employees.[132]

The Eighth Circuit in *Cross* found that employees were required to constantly monitor all unfiltered radio traffic.[133] As a result, they could not attend events or participate in activities that would prevent them from monitoring radio transmissions.[134] For example, "they were unable to entertain guests in the home, attend church or other social gatherings with which audible radio transmissions would interfere."[135] Furthermore, the court found that because the employees were bound by a thirty-minute response time, "the employees are unlikely to participate in activities that cost much money because they may be required to immediately leave . . . ."[136]

Here, Varner was neither bound to his home nor was he required to listen to busy radio traffic at all times. Additionally, Varner admits that he went out to dinner with his family while

---

[130] *Id.*

[131] *Brigham*, 357 F.3d at 937.

[132] *Id.*

[133] *Cross*, 938 F.2d at 916–17.

[134] *Id.*

[135] *Id.* at 917.

[136] *Id.*

on-call.[137] Likewise, while on-call, Varner attended social gatherings at houses other than his own and attended his children's birthday parties.[138] Although he may have received a call during these times, unlike the employees in *Cross*, there is no evidence that Varner was subject to an expectation to respond on-scene within 30-minutes or any particular time at all. It is not disputed that after-hours calls could sometimes disrupt Varner's personal activities or that he was required to stay within cell phone coverage while holding the after-hours phone.[139] Although these aspects of being on-call somewhat limited Varner's flexibility, it is undisputed that Varner was able to—and did—engage in personal activities while on-call. Therefore, this factor weighs against a finding that Varner's time with the after-hours phone was compensable.

    2.  <u>Whether There Was an Agreement Between the Parties that Varner's Time On-Call Was Compensable</u>

"The Court's 'analysis of the [on call] issue . . . does not end' with consideration of '[t]he degree to which the employees were free to engage in personal activities . . . .'"[140] The second factor courts must consider is "the parties' agreement and its significance."[141] An agreement for the purpose of the FLSA analysis may be express "as arising through the employees' acceptance of duty shifts with a prior understanding of how they were to be compensated for those shifts,"[142]

---

[137] Dkt. 16-2 at 17.

[138] *Id.* at 18–19.

[139] *Id.* at 17; Dkt. 16-3 at 2.

[140] *McCoy*, 2013 WL 4510780, at *17 (quoting *Brigham*, 357 F.3d at 938).

[141] *Brigham*, 357 F.3d at 938.

[142] *Id.* at 939 (citing *Berry*, 30 F.3d at 1180).

or may be constructive "as arising from the employees' decision to continue working under the policy."[143]

After establishing the existence of an agreement, courts must then "determine whether the parties characterized the time spent waiting on-call as actual work."[144] In *Berry*, the Ninth Circuit explained:

> An agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work. Conversely, an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work.[145]

"Whether there was an agreement between the employer and the employees that employees would receive compensation only for actual work conducted while on-call is . . . a question of fact . . . ."[146]

In 2011, when Varner began as Shoreside's dispatcher, he was expected to hold the after-hours phone from closing-time to when the office opened the next morning.[147] After Shoreside hired additional personnel, the after-hours phone rotated to other individuals every other weekend.[148] While Varner held the phone during this time, he was compensated by being paid two hours of overtime per week.[149] If Varner reported that he worked more than two hours responding

---

[143] *Id.*

[144] *Berry*, 30 F.3d at 1181.

[145] *Id.*

[146] *Id.* at 1180.

[147] Dkt. 20 at 2.

[148] Dkt. 16-2 at 5.

[149] Dkt. 16-3 at 1.

to after-hours calls in a week, he could report the additional hours and would be compensated accordingly.[150] Varner has admitted that he was aware of these requirements and compensation scheme and continued to work under them.[151] Therefore, from 2011 to 2015, Varner and Shoreside had a constructive agreement regarding compensation for after-hours work.

On November 15, 2015, four years after he began as a dispatcher, Varner and Shoreside entered into the Dispatcher Compensation Agreement.[152] This agreement responded to concerns raised by Varner regarding the after-hours phone.[153] The Dispatcher Compensation Agreement provided that:

> d. For each after-hours period (running from 5:00 p.m. to 8:00 a.m. the following day) the Employee is on-call, Employee shall be paid a minimum of two hours of pay at the overtime rate. In the event Employee works in excess of two hours taking and responding to calls, Employee will be paid for the actual time worked at the overtime rate. The Employee must report all time worked during non-business hours, and all time spent preparing the time log will be paid.[154]

This represents an express agreement between Shoreside and Varner which provides for how on-call time is to be compensated. Therefore, during the entirety of his tenure as Shoreside's dispatcher, Varner had either a constructive or express agreement with Shoreside.

---

[150] *Id.* at 2; Dkt. 16-4.

[151] Dkt. 19-2 at 8.

[152] Dkt. 19-1.

[153] Dkt. 19-4. Varner stated that "It is not my intent or goal to claim 24hours [sic] of on duty pay, but to establish a guideline to make it more appealing/rewarding for others to have the on call phone . . ." *Id.* at 1. Varner proposed Shoreside pay a flat rate per day for carrying the after-hours phone and proposed that the after-hours phone be placed on a rotation so that he could have more days where he was not on-call. *Id.* at 3. Both requests were met in the Dispatcher Compensation Agreement, which paid two hours of overtime per day and established a new rotation schedule to allow Varner two additional days during each week where he was not on-call. Dkt. 16-2 at 20.

[154] Dkt. 19-1 at 1.

A similar agreement was at issue in *Shultz v. City of Tucson*.[155] In that case, police detectives sued the City of Tucson for unpaid overtime compensation for time spent on call.[156] After applying the *Owens* factors the court turned to the collective-bargaining agreement between the parties.[157] The agreement "implicitly recognize[d] that some on-call time is compensable because if the detectives [were] called up for less than two hours, they [were] automatically compensated for a minimum of two hours."[158] The agreement in *Shultz*, like Shoreside's, paid employees a minimum of two hours overtime for being on-call and they would be compensated for any time in excess of two hours that they spent responding to calls.[159] Even though the agreement in *Shultz* recognized that some time spent waiting on-call was compensable, the court found that the balance of factors indicated that the employees were not entitled to compensation for all hours spent on-call.[160]

Here, the agreement between Shoreside and Varner recognizing that some on-call time was compensable, although a predominant factor, is not dispositive.[161] As discussed above, six of the seven *Owens* factors indicate that Varner was able to substantially engage in personal activities while holding the on-call phone. The agreement, which only recognizes two hours of on-call time as compensable, does not outweigh the facts which show that Varner's time on-call was largely at

---

[155] 2005 WL 8160754, at *6.

[156] *Id.* at *1

[157] *Id.* at *6.

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Berry*, 30 F.3d at 1180.

his disposal rather than his employer's. Therefore, after careful review of the record, the Court finds that Varner is not entitled to overtime compensation for each hour he held the after-hours phone. Thus, Shoreside is entitled to summary judgment on this issue as a matter of law.

B.   *Whether Varner is Entitled to Recover for the Uncompensated Time He Spent Actually Responding to Calls*

While Varner is not entitled to additional overtime compensation merely for being on-call, he may be entitled to overtime pay for the time he actually spent responding to calls in excess of two hours. In order to prevail on this claim, Varner must show that the uncompensated activity constitutes compensable "work," that Shoreside had actual or constructive knowledge of the plaintiffs overtime work, and the amount of uncompensated time he actually worked.[162] The time Varner spent responding to customers or Shoreside employees is indisputably "work" which satisfies the first element of an FLSA claim. Furthermore, he also asserts that he informed his direct supervisors of the excess time he spent responding to after-hours calls.[163] Thus, Varner has pleaded facts to satisfy the second element of his FLSA claim. However, Varner has provided no evidence to indicate the amount of uncompensated time he actually spent responding to after-hours calls. Varner vaguely asserts that there was time when he worked more than two hours responding to calls but was not compensated.[164] Yet, there is no evidence on the record that indicates the

---

[162] *Dixon*, 2009 WL 1459447, at *3–6 *accord Maciel*, 569 F. Supp. 2d at 1045.

[163] Dkt. 16-2 at 7.

[164] *Id.*

> Q. Did you ever work four hours one night and not get paid for it?
> A. I'm sure I did.
> Q. When you say you're sure you did, can you give me a specific example of that now?
> A. If you're talking about on site go and clean up a—spill or something like that, where I have to dig up frozen soil and clean up fuel that was spilled on a work site, yes, there were times that I was out there, that I did not get paid for.

number of uncompensated hours Varner worked.[165] The affidavit provided by Varner documents the time he spent holding the after-hours phone but does nothing to elucidate the number of hours spent responding to calls.[166] Because Varner has failed to bear his burden of production on the third element of his FLSA claim, Shoreside is entitled to summary judgment on this issue as well.

Accordingly, Shoreside's Motion for Summary Judgment is **GRANTED** as to Varner's claims brought under the FLSA.

## V. CONCLUSION

For the foregoing reasons, Shoreside's Motion for Summary Judgment filed at docket 15 is **GRANTED**. The Clerk is directed to issue a form of Judgment accordingly.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 21st day of October, 2019.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

Q. How many times did that happen?
A. I have no idea. *Id.*

[165] Moreover, Varner cannot recall—or even estimate—how many weeks he spent more than two hours two hours responding to calls:

Q. In a week. Of those 52 weeks, how many do you think you exceeded two hours?
A. I have no idea.
Q. One week?
A. I have no idea, sir.
Q. Ten weeks?
A. I, once again, have no idea. Dkt. 16-2 at 6.

Q. Okay. Prior to the [2015] negotiation, how often did you exceed two hours a week of actual on the phone or on site?
A. I—I honestly don't know . . . . *Id.* at 16.

[166] Dkt. 20 at 7–40.